[No. B221980. Second Dist., Div. One. Aug. 31, 2010.]

MICHAEL DONNELL BROWN, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Peter Swarth for Petitioner.

No appearance for Respondent.

Steve Cooley, District Attorney, Irene Wakabayashi, Phyllis C. Asayama and Tracey W. Lopez, Deputy District Attorneys, for Real Party in Interest.

**OPINION**

**MALLANO, P. J.**—Petitioner Michael Donnell Brown filed the instant petition for a writ of mandate to challenge the trial court's denial of his double jeopardy motion to preclude retrial after a jury acquitted him of some counts, convicted him of a lesser included offense as to one count, and hung on the remaining counts. We conclude that double jeopardy bars retrial of all of the charges the trial court permitted to be retried because (1) in the case of one victim, the jury acquitted petitioner of offenses, all of which were alleged

to have been committed within the same five-month interval, and the prosecutor failed to show that none of the acquittals pertained to the offense the court agreed to permit the prosecutor to retry, which was also alleged to have been committed in the same five-month interval; and (2) in the case of the other victim, the jury acquitted petitioner of continuous sexual abuse of a minor based upon the same conduct and during the same 22-month interval alleged in four counts the court agreed to permit the prosecutor to retry. Accordingly, we grant the petition.

## BACKGROUND

A 23-count information filed April 30, 2008, charged petitioner with the commission of various sexual offenses against two minors, Caleb C. and Kyle C. With respect to alleged victim Caleb, counts 1 through 13 charged petitioner with forcible oral copulation in violation of Penal Code section 288a, subdivision (c)(2) on or between the dates of October 1, 2006, and March 8, 2007; counts 14 through 16 charged him with sodomy by force during the same range of dates; count 17 charged him with assault with intent to commit a felony on August 1, 2006; and count 18 charged him with attempted sodomy by force on or between the dates of October 1, 2006, and March 8, 2007. (All undesignated statutory references pertain to the Penal Code.) With respect to alleged victim Kyle, counts 19 through 22 charged petitioner with committing a forcible lewd act upon a child under the age of 14 in violation of section 288, subdivision (b)(1) on or between the dates of April 15, 2005, and March 2, 2007; count 23 charged him with continuous sexual abuse of a child under the age of 14 in violation of section 288.5, subdivision (a) during the same date range. The information also alleged, with respect to all counts, that the crimes involved multiple victims. (§ 667.61, subd. (b).)

Petitioner waived a preliminary hearing and proceeded to trial on all of the charges.

Alicia C., the mother of Caleb and Kyle, testified that petitioner is her nephew. She and her husband permitted petitioner and his girlfriend, Maria Pereyra, to move in with her family in their two-bedroom mobilehome in March of 2004 because petitioner and Pereyra had nowhere else to go. Petitioner and Pereyra slept and kept some of their property in the living room. They did not move out until February of 2007. (Unless otherwise noted, all further date references pertain to 2007.) Alicia moved out of the mobilehome in September of 2006 and moved back in after March 8.

Alicia testified that when petitioner first moved in with her family, she saw him "moon" the boys and they responded in kind. She instructed petitioner

and the boys not to "moon" anyone. Sometime in 2006 she noticed that petitioner seemed "guarded" around Caleb, and in December of 2006, she learned that Pereyra had complained that petitioner spent too much time with Caleb and Kyle. But prior to March 8, neither of the boys complained that petitioner did anything to them or asked not to be left alone with petitioner. Alicia testified that starting around January of 2007, petitioner spent more time with Caleb and volunteered to watch him. She noticed that around the same time, Caleb, who suffers from severe sickle-cell anemia, slept more, was more withdrawn, and had more health crises. On at least one occasion after petitioner and Pereyra moved out of the mobilehome, Caleb and Kyle went—without objection—to petitioner's new residence to play video games with him.

Caleb was born in October of 1992. He testified that he called the police on March 8 because petitioner "sexually assaulted" him. Caleb stayed home from school that day due to a sickle-cell crisis that caused him pain and fatigue. Caleb was in his room, polishing his bowling ball, when petitioner arrived at the mobilehome. Caleb was not expecting him. They briefly conversed, then petitioner went into the living room. Caleb joined petitioner in the living room. He testified that he did so because he did not want petitioner to know he was upset and because he "knew that something had to happen in order for me to, to, you know—arrested, obviously." Caleb sat down on the couch. Petitioner pulled down Caleb's pants and put Caleb's penis into his mouth. Caleb thought he might have pushed petitioner's hand away when he began to pull down Caleb's pants. Caleb did not want petitioner to orally copulate him, but he did not fight or say anything because he was tired. After about a minute, petitioner stopped. Caleb pulled his pants back on or tried to. Petitioner gave him a pair of sweatpants to put on. As Caleb stood and put on the sweatpants, petitioner pulled them down and again orally copulated Caleb for about a minute. Caleb did not do anything to try to stop petitioner from doing so.

Caleb initially testified that petitioner then got tired and lay down on the couch, while Caleb went into his room, locked the door, and thought about his "next plan." After a time, he got his pool cue and left to phone 911 from a public restroom. Following a court recess, during which Caleb listened to a recording of his police interview, he changed his testimony to describe additional sex acts on March 8. He testified that there was a third incident of oral copulation, then petitioner lay atop him, with petitioner's head toward Caleb's toes and vice versa. Petitioner attempted to put his penis in Caleb's mouth, but Caleb turned his head and petitioner's penis hit Caleb's cheek. Caleb tried to move but petitioner was too heavy. Caleb then somehow got out from beneath petitioner and onto all fours on the couch, with his "butt . . . kind of in the air." Petitioner licked Caleb's buttocks. This caught Caleb "off guard" and he turned his body. Petitioner then orally copulated Caleb again.

Caleb somehow ended up in the same all fours position and petitioner placed one of his fingers between Caleb's buttock cheeks "next to" the anus and also placed his penis "on the crack." Caleb moved his body and this apparently ended the incident. Without a word to petitioner, Caleb went into his room and locked the door. Caleb testified that petitioner came to the door of Caleb's room and said he was going to play with Caleb's PlayStation. Caleb grew quite angry about the prospect of petitioner using his PlayStation, so he opened the door and argued with petitioner. Caleb also pointed an Airsoft gun at petitioner and threatened to shoot him if he used the PlayStation. Petitioner then lay down on the sofa and fell asleep. Caleb got his pool cue and left his room. He knew that he had petitioner's DNA on him and did not shower or wash. He awakened petitioner and said that he was going to play pool, then left and phoned 911 and his father.

Caleb testified that he had experienced prior incidents of "sexual assault" by petitioner. The first incident was around the middle of October 2006. Caleb was out of school recovering from an appendectomy performed a week earlier. He was lying facedown on the floor behind the couch in an area where petitioner kept his clothes and television. Petitioner got on top of Caleb and began grinding against Caleb's buttocks. Caleb felt petitioner's penis become erect. Both were fully clothed at the time. Petitioner's weight hurt Caleb's surgical incision. About 90 minutes later, petitioner orally copulated Caleb for the first time, but Caleb testified he did not remember any details. Caleb also remembered no details regarding other instances, but testified that petitioner orally copulated him at least 25 times. The incidents were not all the same, but every incident occurred either in the living room or in Caleb's bedroom around noon on a day when Caleb did not attend school. On one occasion, Caleb's father was home while petitioner orally copulated him, but Caleb thought his father was taking out the trash. Caleb did not cry out for his father or threaten to do so. In fact, he did not say anything to petitioner, but he testified that on every occasion he "slapped [petitioner's] hands away." He did not say what petitioner was doing with his hands when Caleb slapped them. On another occasion, Caleb's mother was home, but Caleb thought she was in the shower at the time.

Caleb testified that on two occasions prior to March 8, petitioner attempted to have Caleb sit on petitioner's penis as petitioner sat on the couch. On each occasion, petitioner's penis touched Caleb's buttocks. Caleb testified that on one other occasion prior to March 8, petitioner "grabbed his penis and put it in [Caleb's] mouth" while petitioner orally copulated Caleb. Caleb tried to turn his head, and was eventually able to do so.

Caleb testified that he did not tell anyone about the incidents "[b]ecause if I would have done that, it would have never got this far where we are right

now." He further explained, "Because he would have denied. And then we would have had no evidence, and he would have walked." Caleb later added that he knew his parents would believe him, but he thought his father would hurt petitioner and his mother would purchase a gun, then shoot petitioner. He also failed to tell anyone at school because they would have told his parents and the result would have been the same. Instead, he took his time to formulate his plan, which included preserving petitioner's DNA as evidence. After each incident, his plan came together a bit more. He testified, "I told myself that I was going to let it happen to a point where, you know, I just couldn't deal with myself any more." Asked what was different about March 8 that caused Caleb to report the incident, Caleb replied, "He fell asleep." Although Caleb phoned his father and told him about the incident right after phoning 911, he hoped the police would arrive before his father.

Caleb testified that he did not want to engage in sex acts with petitioner and did not voluntarily participate. He knew it was illegal and felt it was immoral. The court asked Caleb whether he did anything, with respect to any of the incidents, to "show displeasure or let the defendant know that you didn't want to do it?" Caleb replied that he slapped petitioner's hands away and "[o]n most of them when . . . he was on top of me, I was trying to get [out] from under him." Caleb admitted that petitioner never threatened or hit him and he did not fear petitioner. When the court asked Caleb whether petitioner did anything to overcome his will, Caleb testified, "Only well, laying on top of me and holding me down."

When defense counsel questioned Caleb about how often he missed school in the fall of 2006, Caleb testified that he had nearly perfect attendance. On redirect, Caleb testified that his attendance was actually poor, and when he referred to near perfect attendance, he had been thinking of his attendance while he was homeschooled in 2007.

The assistant principal of Caleb's high school testified that Caleb's attendance rate during the months of September through December of 2006 was 4 percent. He missed many full or partial days, and on a number of days he was present at the beginning and end of the schoolday, but not for some of the classes in between. In December of 2006, Caleb withdrew from the school and entered an alternative program for two months, due to his health. He re-enrolled at the high school in February. On March 8, he was absent for all periods except homeroom.

A sexual assault nurse examined Caleb on the night of March 8 and collected swabs for DNA testing. A swab taken from the shaft of Caleb's penis contained epithelial cell DNA matching petitioner, as the "major donor," and Caleb, as the "minor donor." Epithelial cells are present in both

saliva and skin. The DNA expert testified that while it would be possible for a person to acquire some of a second person's DNA on his skin by wearing the second person's watch, only a small amount of DNA would be transferred, so the watch owner would be the minor donor.

Kyle was born in April of 1998. Kyle testified that from the summer of 2006 to the beginning of November of 2006, petitioner "molested" him. On every occasion, Kyle was in his bedroom, sitting on his bed. Kyle testified that on five occasions, petitioner pushed him so that he was lying facedown on his bed. Petitioner then lay on top of Kyle and "humped" him by moving his body up and down against Kyle's body. Although both petitioner and Kyle were completely clothed, Kyle testified that he could feel petitioner's erect penis against his buttocks. Each incident lasted about 30 seconds, and there were five such incidents. Except during the third incident, neither Kyle nor petitioner spoke. During the third incident, petitioner told Kyle that if he told anyone, petitioner would tell Kyle's mother that Kyle "wanted to do it."

Kyle initially testified that neither he nor petitioner was ever unclothed during any of the incidents. He reviewed a portion of a police report and testified he did not remember "those things happening." After proceedings outside of Kyle's and the jury's presence, Kyle testified that the report had helped him to remember two other incidents in which petitioner put his penis in Kyle's mouth and Kyle's penis in his mouth. The first time this happened was later on the day of the third "humping" incident. Kyle did not state when the second incident of oral copulation occurred. Each of these incidents also lasted about 30 seconds. During the second incident, petitioner used his hands to pull Kyle's mouth open.

Kyle testified that prior to March 8, he did not tell anyone what petitioner had done because it was embarrassing. Also, Kyle was "kind of afraid" of petitioner, although petitioner never hit him, physically hurt him, or threatened to physically hurt him. After petitioner was arrested, Alicia asked Kyle if petitioner "did it to [him], too." Kyle said, "Yes."

Pereyra testified that petitioner was her boyfriend while they lived with the C. family. She stopped communicating with petitioner about one year before trial. After petitioner was arrested, he called Pereyra from jail. She asked him what happened. Petitioner told her that "something was happening between him and Caleb," "they were getting too close to each other," and "[t]here was too much playing" "and mooning each other." Pereyra was an extremely reluctant and emotional witness. The trial court repeatedly ordered Pereyra to answer questions and threatened her with contempt. Eventually, Pereyra testified that petitioner told her he and Caleb touched each other's penises. She testified that petitioner told her he went to the C. house "to pick

up some mail. And they were playing with each other, you know playing with the bowling ball. And got to the point where Caleb was naked. And he—[petitioner] had said that he didn't want to play at the moment. But Caleb kept playing with him and eventually he started playing with him." Petitioner told her they were wrestling and "Caleb was playing with [petitioner's] Bluetooth and his watch." After reviewing the police report, Pereyra testified that petitioner told her "there were . . . four prior occasions in which he and Caleb orally copulated each other or there was some oral sex." In the same conversation, petitioner told Pereyra that he had admitted to police that he engaged in sex acts with Caleb because "police had threatened him to put him with people that would stomp and kill him."

Officer Darryl Williams testified that he and his partner detained petitioner at the mobilehome park on March 8. After Williams returned to the police station, he heard from another officer that petitioner wanted to speak to him. Williams went to petitioner's holding cell, and petitioner said he wanted to talk about what happened. Williams expected petitioner to make a "quick statement" denying guilt, but he moved petitioner to an interview room to talk. Petitioner then explained that about seven months earlier he "began trying to get Caleb comfortable with talking about sex, so he would make sexual jokes, sexual references." "Then he said he would touch Caleb and have Caleb touch him through their clothing. And he would try to get Caleb to expose himself and he would expose himself to Caleb." Petitioner said that from January through March of 2007, he "would wrestle with Caleb. And then he would pull Caleb's pants down, and that he placed his penis in Caleb's mouth and Caleb's penis in his mouth." Petitioner also "said he placed his finger in Caleb's anus, placed his penis against Caleb's anus, but did not penetrate." Petitioner also "said that he would masturbate in front of" Caleb, but leave the room before ejaculating. Petitioner said this happened three or possibly four times. Regarding March 8, petitioner told Williams that he "called to the house. And when he determined that Caleb was home alone, then he decided to go over to the house believing he would probably have sex with Caleb." Petitioner told Williams that he did not have any sexual contact with Kyle. Petitioner was calm and was not crying during the interview. Williams did not electronically record petitioner's statement or ask petitioner to sign a written statement. Williams thought he had taken notes, but had not kept them. Williams later told his partner what petitioner said, paraphrasing petitioner's words, and Williams's partner put the statement in their arrest report.

Petitioner testified in his own defense and denied doing "the things to Caleb [and Kyle] that [they] testified about." Petitioner testified that he had a friendly relationship with Caleb, but eventually he felt that Caleb had gotten "a little too close" to him. Caleb "always wanted to be around" and did not give petitioner and Pereyra "the space that [they] needed." When petitioner

and Pereyra tried to have private conversations behind the couch, Caleb would join them. Petitioner would tell Caleb to leave, and Caleb would become "irritated."

Petitioner testified that Caleb often "mooned" him playfully. Occasionally, petitioner returned the gesture. Caleb told petitioner about swimming nude with a friend named Boston, and petitioner saw Caleb photograph his own bare buttocks with a mobile phone, then send the photo to Boston. Petitioner also testified that "quite a number of times" he "walked in on" Kyle masturbating and told him to stop.

Petitioner testified that on March 8, he phoned the C. home and told Caleb he was coming by to pick up mail. The mail had not been delivered when petitioner arrived, so he lay on the couch after placing his Bluetooth, watch, wallet, phone, and cigarettes on a counter. Caleb approached the couch with a bowling ball and asked, " 'What would you do if I dropped this bowling ball on your dick?' " Petitioner told Caleb to stop playing, and stepped outside to smoke. When petitioner went back into the house, Caleb was "prancing around" naked, holding petitioner's phone, and wearing petitioner's Bluetooth on his ear and petitioner's watch on his erect penis. Petitioner "snatched" back his watch, phone, and Bluetooth, spat on Caleb's chest, and told Caleb he was disgusting. Caleb was upset; he ran into his room and shut the door. Petitioner lay back down on the couch to await the mail, and fell asleep. Caleb awakened petitioner and said he was going to play pool.

Petitioner testified that when Williams detained him, Williams threw him against the side of the mobilehome, told him that it was illegal to orally copulate a 15 year old, and threatened, " '[I]f you don't admit to it, I'm going to make sure I put you with people that will count it as a badge of honor to stomp you out and kill you.' " Williams was red in the face and seemed angry. Petitioner believed Williams's threat and was "very afraid." While petitioner waited at the police station, Williams gave him an angry look that petitioner understood to mean, "I had better tell him what he wanted to hear." When Williams took petitioner into an interview room, Williams began "making allegations," asking petitioner if particular things happened. Petitioner repeatedly said, " 'Yeah,' " because he was afraid and thought Williams would carry out his threat. None of the things he admitted was true. Petitioner told Williams that nothing ever happened with Kyle because "Kyle wasn't the issue," and Williams had only threatened petitioner regarding conduct with Caleb. Petitioner was not questioned about his admissions to Pereyra.

Petitioner's friend George del Valle testified that he was often at the C. home because he and petitioner carpooled to work. He also spent some leisure time with the C. family. Del Valle testified that Caleb "would come

into the family room partially undressed. He would greet me with very awkward hugs, prolonged hugs" that made del Valle feel uncomfortable. Del Valle saw Caleb "mooning" petitioner at the pool. And once, when del Valle teased Caleb about wearing SpongeBob pajamas, Caleb became irritated and reached toward del Valle's crotch. Del Valle grabbed Caleb's arm and looked to petitioner for assistance. Petitioner told Caleb to stop. Del Valle never saw any indication that either Caleb or Kyle feared petitioner.

Michelle Brown, who is petitioner's sister, Alicia's niece, and Caleb's cousin, testified that she often visited the C. home while petitioner lived there. On one occasion, Caleb walked into the room and sat on the floor, completely nude. Alicia sent Caleb to his room. Michelle saw Caleb and petitioner play video games together during the period in which Alicia was not living in the mobilehome, and observed no difference in their relationship. Neither Caleb nor Kyle seemed to be "standoff-ish" or fearful around petitioner.

Petitioner also presented an expert witness, forensic psychologist Dr. Ronald Fairbanks, who testified that he interviewed and tested petitioner. He opined that petitioner exhibited no psychopathy, did not fit the profile of a child molester, and posed a lower risk of committing sexual offenses than that of the general population.

Williams testified in rebuttal that he did not grab petitioner, slam him against a wall, yell, or use any force while arresting petitioner. Williams was not asked whether he threatened petitioner.

The court granted petitioner's section 1118.1 motion to dismiss counts 14 through 18.

In his arguments to the jury, the prosecutor stated in connection with the March 8 incident involving Caleb and count 13: "13, the 13 is just for your information in terms of our mindset. The 13th is the March 8th, '07 incident. You have to actually find which charge goes with which event. And to make that easy for you, when you consider Caleb's testimony, look, either you believe him or you don't. So either it happened over twenty times or it didn't happen at all. That's just the nature of it. [¶] Caleb, there is no in between here in this case. And when we present 13 charges to you, just to make it easy so you don't have to fish out, you know, which charge went with which incident Caleb was talking about. These first 12 charges or 12 incidents he is talking about, and then the 13th being March 8th, '07. I hope that makes sense. Otherwise we have to figure out Caleb said over 25 times, which one is count number 2, which one is count 3. [¶] Just to make it easy for you, if

you believe it happened, they all happened. I'm just asking you to take the first 12 as—assume that those are the first 12 counts, and count 13 as March '07."

With respect to the charges naming Kyle as the victim, the prosecutor told the jury, "Continuous sexual abuse is an alternative. And when I say alternative, what I mean is: all the things that Kyle testified to from, I think he said, the summer of 2006 to some time before Christmas—I think he actually specified—in November of 2006 that six incidents happened. Counts 19 through 22 address four of those incidents. [¶] As an alternative, count 23 is just a more general charge saying that in this general time period, instead of specifying date by date or incident by incident, in a three month or longer period, multiple acts happened. And that's a separate charge. It's not anything in addition to counts 19 through 22, but just an alternative, another way of looking at it as a separate crime. [¶] You will hear instructions later. Ultimately you are to decide each count: is he guilty or not? [¶] If you find that for Kyle's count 19 through 22 that the defendant is guilty of the individual four counts, you can still, if you find everything is met in terms of elements, you can still find the defendant guilty of the separate but alternative count 23. [¶] What happens after that is an issue that's beyond what your role is for this trial."

The prosecutor later argued, "For Kyle there were 16 [sic] incidents that he alleged. To simply [sic], because you have to determine which count for which incident, since there are four counts, either you believe Kyle or you don't. That event happened or they didn't. [¶] I know there are two different kinds. He talked about humping, which qualifies as a lewd act, and he talks about oral sex, which also qualifies as a lewd act. So it doesn't matter which ones. [¶] But since you have to determine which charge goes with which incident, I'm just going to make it easy for you. First, counts 9 [sic] through 22, the first four acts that Kyle described. Then the last count, count 23, again it's just an alternative way to look at Kyle's incidents. Instead of looking individually, I'm asking you after you do that to consider it again in this other charge of, did it happen in a month, in a period of over three months or more? Did at least three incidents happen? And you don't have to agree on which three. And did they happen to Kyle while he was under 14?"

In his argument to the jury, defense counsel focused upon reasons to doubt the credibility of Caleb, Kyle, and Williams and suggested that the positive DNA match was a result of Caleb's either putting petitioner's watch on his penis or wiping the saliva petitioner spat on him onto his penis. Defense counsel did not specifically challenge the sufficiency of proof regarding any particular element, such as force, lack of consent, or the time interval regarding the acts against Kyle, but instead simply maintained that none of the acts occurred.

The trial court did not instruct the jury that count 23 was an alternative to counts 19 through 22. None of the verdict forms pertaining to any of the counts specified a particular date or a date range.

The jury acquitted petitioner of counts 7 through 10 and 23. It acquitted him of forcible oral copulation in count 6, and instead convicted him of the lesser included offense of misdemeanor battery. The jury could not reach a verdict on any of the other counts, and the trial court declared a mistrial as to these counts.

Petitioner objected to a retrial on the ground that double jeopardy precluded retrial of the counts as to which a mistrial was granted. He also reasserted an argument he had raised during trial that pleading a violation of section 288.5, subdivision (a) in count 23, along with violations of section 288, subdivision (b)(1) alleged to have occurred during the same time interval in counts 19 through 22 violated section 288.5, subdivision (c), and barred retrial of counts 19 through 22. The prosecutor argued that retrial of all counts was permissible.

The trial court ruled that the collateral estoppel aspect of double jeopardy precluded retrial of counts 1 through 5, 11, and 12, but retrial of count 13 was permissible based upon the prosecutor's argument to the jury: "The prosecutor in his final argument . . . did argue that the last incident involved count 13. [¶] Now I can't say that the jury had the right to assume chronologically that the first act was count one and everything going up to count 13 is appropriate and say, well, the jury acquitted on counts 6 through 10, although they found a lesser on one, misdemeanor lesser, and that the D.A. should be entitled to retry counts 1 through 5 and 11 through 13. [¶] But I know count 13, I feel safe in saying that on count 13, the D.A. did argue that that is the last date, the outside date, and consider that as the last sexual act. And if they hung on that, I don't see issue preclusion being involved, *Yeager* [*v. United States* (2009) 557 U.S. ___ [174 L.Ed.2d 78, 129 S.Ct. 2360]] being involved in that. I see confusion being involved in everything except count 13." The court also held that counts 19 through 22 could be retried because count 23 involved "different elements."

Petitioner filed a petition for a writ of mandate or prohibition, challenging the court's decision to permit retrial of count 13 and counts 19 through 22. We issued an order to show cause. Real party in interest the People (the prosecutor) filed a return, and petitioner filed a traverse.

## DISCUSSION

█ Petitioner contends, as he did in the trial court, that double jeopardy precludes retrial of count 13 and counts 19 through 22. We conclude that

double jeopardy bars retrial of all of the charges the trial court permitted to be retried because (1) in the case of one victim, the jury acquitted petitioner of offenses, all of which were alleged to have been committed within the same five-month interval, and the prosecutor failed to show that none of the acquittals pertained to the offense the court agreed to permit the prosecutor to retry, which was also alleged to have been committed in the same five-month interval; and (2) in the case of the other victim, the jury acquitted petitioner of continuous sexual abuse of a minor based upon the same conduct and during the same 22-month interval alleged in four counts the court agreed to permit the prosecutor to retry.

The double jeopardy provisions of the federal and state Constitutions protect against successive prosecutions for the same offense after acquittal or conviction, and against multiple punishment for the same offense. (*North Carolina v. Pearce* (1969) 395 U.S. 711, 717 [23 L.Ed.2d 656, 89 S.Ct. 2072]; *People v. Anderson* (2009) 47 Cal.4th 92, 103–104 [97 Cal.Rptr.3d 77, 211 P.3d 584].) Double jeopardy includes an issue preclusion component: once an issue of ultimate fact has been resolved in a criminal proceeding, it cannot be relitigated in a subsequent prosecution or retrial. (*Yeager v. United States, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2367] (*Yeager*); *Ashe v. Swenson* (1970) 397 U.S. 436, 443, 445 [25 L.Ed.2d 469, 90 S.Ct. 1189] (*Ashe*).)

"To decipher what a jury has necessarily decided, we held that courts should 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' [Citation.]" (*Yeager, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2367].) "If there is to be an inquiry into what the jury decided, the 'evidence should be confined to the points in controversy on the former trial, to the testimony given by the parties, and to the questions submitted to the jury for their consideration.' [Citations.]" (*Id.* at p. ___ [129 S.Ct. at p. 2368].) "[I]ssue preclusion is 'predicated on the assumption that the jury acted rationally.' [Citation.]" (*Id.* at p. ___ [129 S.Ct. at p. 2369].) "[C]onsideration of hung counts has no place in the issue-preclusion analysis." (*Id.* at p. ___ [129 S.Ct. at p. 2368].) "[C]onjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return." (*Ibid.*) "To identify what a jury necessarily determined at trial, courts should scrutinize a jury's decisions, not its failures to decide." (*Ibid.*) "The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' [Citation.]" (*Ashe, supra*, 397 U.S. at p. 444.)

Generally, a defendant bears the burden of establishing facts showing that he or she has been placed in double jeopardy by reason of a prior conviction or acquittal. (*People v. Burkhart* (1936) 5 Cal.2d 641, 643 [55 P.2d 846] (*Burkhart*); *People v. Morales* (2003) 112 Cal.App.4th 1176, 1187 [5 Cal.Rptr.3d 615] (*Morales*); *People v. Mason* (1962) 200 Cal.App.2d 282, 285 [19 Cal.Rptr. 240].) One common context giving rise to this rule is one in which the trial court, at the outset of a prosecution, is confronted with a contention by a defendant regarding a conviction or acquittal in separate, prior proceedings purportedly based upon the same operative facts. For example, in *Burkhart*, the defendant was charged with driving under the influence of alcohol. The parties stipulated that the defendant had previously pleaded guilty to violating a county ordinance by " 'being drunk on a public highway,' " based upon the same incident, and the defendant raised a plea of twice in jeopardy based upon that conviction. Both the trial and appellate courts rejected the double jeopardy contention on the ground that the defendant failed to meet his burden of proof because he failed to provide a copy of the county ordinance to prove that the elements of the offenses were the same. (*Burkhart, supra*, 5 Cal.2d at pp. 642–644.) Similarly, in *Mason*, the defendants were charged with escaping from prison. They pleaded twice in jeopardy based upon disciplinary action taken against them by the adult authority for their escape. The trial and appellate courts rejected their claims for lack of evidentiary support. (*Mason, supra*, 200 Cal.App.2d at pp. 283–285.)

Another common context in which the defendant bears the burden of establishing facts to prove his or her double jeopardy claim is a challenge to a retrial after a jury has rendered a verdict as to some, but not all, of the charges. For example, in *Morales, supra*, 112 Cal.App.4th 1176, a jury acquitted the defendant of murder, which had been presented to the jury on a felony-murder theory only, but hung on two counts of robbery. The jury at the retrial convicted the defendant of the robbery charges. (*Id.* at pp. 1178, 1184.) On appeal, the defendant argued that his acquittal of murder on a felony-murder theory barred retrial of the robbery charges. The Court of Appeal placed the burden of proof on the defendant and concluded that the verdict on the felony murder showed that "for whatever reason, the jury did not believe that defendant participated in a robbery." (*Id.* at p. 1188.) The court then attempted to analyze why the first jury had been unable to reach verdicts on the robbery charges—precisely the sort of analysis that the United States Supreme Court barred in the later decided *Yeager* case. (*Morales*, at pp. 1188–1191.) Ultimately, the *Morales* court concluded that "because [the first] jury deadlocked on the robbery charges, defendant cannot carry his burden of proving that it made any such determination." (*Id.* at p. 1191.)

*People v. Smith* (2005) 132 Cal.App.4th 1537 [34 Cal.Rptr.3d 472] (*Smith*) also presented the issue of retrial following jury verdicts on some, but not all,

of the charges. The prosecutor charged Smith with 10 counts of violating section 288, subdivision (a), " '[o]n or about and between January 01, 1996, and October 01, 1999,' " using "identical generic statutory language to describe each of the 10 counts." (132 Cal.App.4th at p. 1540 & fn. 2.) The victim testified that Smith committed three different varieties of lewd acts with her: five to 10 acts of one variety and more than 10 of each of the other varieties, with each variety of act occurring in a different place. In addition, an interviewer testified that the victim had told her about "two separate discrete times when defendant had molested her." (*Id.* at pp. 1541–1542.) The jury convicted the defendant on count 1, could not reach a verdict on count 2, and acquitted him of the other eight counts. The prosecutor did not seek retrial of count 2, but Smith appealed his conviction on count 1. (*Id.* at pp. 1540–1541.)

The Court of Appeal reversed Smith's conviction because the trial court refused to give a specific acts unanimity instruction. (*Smith, supra,* 132 Cal.App.4th at pp. 1543–1547.) It then addressed Smith's contention that he could not be retried on either count 1 or count 2 because it was "impossible to determine which facts were found and rejected by the jury in finding defendant not guilty of counts three through ten." (*Id.* at p. 1547.) The court noted, "In usual circumstances, the burden is on the defendant to prove that he or she has been placed in double jeopardy by reason of a prior conviction or acquittal. This common context was presented in the seminal case of *People v. Burkhart* (1936) 5 Cal.2d 641 [55 P.2d 846]. . . . Here we are faced with unusual circumstances that will likely lead to a shift of the burden of proof on retrial. [¶] The context before us is unlike that in *Burkhart,* where the defendant pleading once in jeopardy faced no procedural disadvantage attributable to a prosecutorial misstep. Here the likely inability of defendant to prove the defense is attributable to a deliberate decision by the prosecution to charge, argue, and support instructions to the jury that were inconsistent with the specificity of the evidence presented. [¶] The prosecution charged this case using nondifferentiated identical statutory language for each count. It tried and argued the case on the theory that the acts of molestation testified to by the victim were indistinguishable, and then presented testimony of three distinctly different types of molestation that occurred in different locations of the residence and not necessarily on the same days, as well as two instances of specifically described acts through [the victim's] pretrial statements. It then fully concurred with the trial court in the giving of the erroneous modification of CALJIC No. 4.71.5; all the while presenting to the court an incorrect description of the holding in [*People v.*] *Jones* [(1990)] 51 Cal.3d 294 [270 Cal.Rptr. 611, 792 P.2d 643]." (*Smith, supra,* 132 Cal.App.4th at p. 1548.)

■ The *Smith* court continued, "In this unusual context we will follow the procedure adopted in nine federal circuits and by several states when, as

here, unique circumstances associated with the prosecution's charging decisions and the charges themselves necessitate shifting the burden to the prosecution once defendant makes a nonfrivolous showing that an indictment or information charges him with an offense for which he was formerly placed in jeopardy. The shift occurs in the federal setting when a defendant is being retried on a conspiracy charge for which defendant maintains he has been convicted or acquitted. [¶] If, on retrial, defendant enters a plea of once in jeopardy, he will be allocated the initial burden of going forward. He must make a nonfrivolous showing that an indictment or information charges him with an offense for which he was formerly placed in jeopardy. The burden will then shift to the prosecution to establish by a preponderance of evidence that the new charges involve different offenses than those the defendant was acquitted of committing." (*Smith, supra,* 132 Cal.App.4th at p. 1549, fn. omitted.)

The *Smith* court also rejected a contention by the Attorney General that Smith assumed the " 'risk of a future undetectable double jeopardy violation' " by failing to demur to the information. (*Smith, supra,* 132 Cal.App.4th at p. 1549.) The court noted that in *People v. Jordan* (1971) 19 Cal.App.3d 362 [97 Cal.Rptr. 570], upon which the Attorney General relied, the offenses "arose from specific and factually distinguishable acts committed on a single occasion. Since the prosecution knew which acts they were relying upon to support each count, the indictment was demurrable to cure the lack of specificity. In the present case, the offenses were pleaded on the theory that they would be proven by generic testimony, i.e., conduct occurring over several years where the facts of one offense are indistinguishable from those of the other offenses. Since generic testimony violates neither a defendant's constitutional due process right to notice nor to present a defense ([*People v.*] *Jones, supra,* 51 Cal.3d at pp. 317–321), we do not see, and the Attorney General has not shown, how demurring to the instant pleading could have assisted the defendant in avoiding the present double jeopardy problem. [¶] Moreover, based upon the generic nature of the pleadings, defendant had no reason to anticipate a potential future double jeopardy problem—he would either be convicted of all of the offenses or none of them, and therefore no double jeopardy issue could arise. What defendant could not reasonably anticipate was that the prosecution would present evidence of distinguishable acts, and that the trial court, backed by the prosecution, would not give the correct modification of CALJIC No. 4.71.5 as set forth in *Jones.* Consequently, defendant cannot be faulted for failure to demur to the information." (*Smith, supra,* 132 Cal.App.4th at pp. 1549–1550.)

The situation presented here is far more analogous to *Smith* than to *Morales* or *Burkhart.* Counts 1 through 13 all alleged violations of the same statute and all were identically pleaded in the generic statutory language. The same was true of counts 19 through 22. Count 23 employed generic statutory

language and the same date range as counts 19 through 22 and was not pleaded in the alternative, as required by section 288.5, subdivision (c). The prosecutor seemingly anticipated that the various counts would be proved by generic testimony, yet Caleb and Kyle each testified to different types of conduct, occurring on different occasions, and provided fairly detailed testimony with respect to certain incidents and generic testimony with respect to others. The prosecutor then argued, with respect to each named victim, that the jury should either believe that all of the acts to which the victim testified occurred or none of them occurred. With respect to Kyle, the prosecutor described count 23 as "alternative" to counts 19 through 22, but argued that the jury could convict him of count 23, as well as counts 19 through 22. Neither the instructions nor the verdict forms tied any particular count to a particular incident. Because such generic pleading is permissible, no significance can be attached to petitioner's failure to demur to the generic nature of the pleading. As in *Smith*, petitioner "had no reason to anticipate a potential future double jeopardy problem—he would either be convicted of all of the offenses or none of them, and therefore no double jeopardy issue could arise." (*Smith, supra*, 132 Cal.App.4th at p. 1550.)

Heeding the United States Supreme Court's directive to apply " 'a practical frame' " to the double jeopardy inquiry and view it " 'with an eye to all the circumstances of the proceedings' " (*Ashe, supra*, 397 U.S. at p. 444), we conclude that given the unique circumstances created by the prosecutor's strategic decisions on how to charge and try the case and the nature of the charges, the interests served by the double jeopardy clause, namely, "protect-[ing] a man who has been acquitted from having to 'run the gantlet' a second time" (*Ashe*, at p. 446), necessitate shifting the burden of proof to the prosecutor upon petitioner's nonfrivolous showing that he faces prosecution for an offense for which he was formerly placed in jeopardy. To do otherwise would force petitioner to overcome the uncertainty, confusion, and procedural disadvantage attributable to the prosecutor's tactical decisions.

We further conclude that petitioner satisfied his initial burden. The trial court that ruled upon his double jeopardy motion sat through the original trial that led to the acquittals, misdemeanor battery conviction, and mistrial. It had heard all of the evidence and argument at trial and was familiar with the parties' theories of the case. The court was aware that the prosecutor wanted to retry charges that were based upon some of the very same incidents the prosecutor tendered to the jury during the just-completed trial. Unlike a case such as *Burkhart*, there was no uncertainty about prior unrelated proceedings or whether prior proceedings were based upon the same alleged criminal conduct. Indeed, the trial court sustained petitioner's double jeopardy objection with respect to counts 1 through 5, 11, and 12. Here, there is uncertainty and confusion concerning which incidents presented by the testimony of Caleb and Kyle pertained to the counts as to which the jury acquitted and

convicted petitioner. We thus deem the burden of proof to have shifted to the prosecutor to establish by a preponderance of evidence that the charges to be retried involved different offenses than those petitioner had already been convicted or acquitted of committing.

We note that petitioner faults the trial court for failing to conduct an evidentiary hearing and the prosecutor for failing to introduce evidence to carry its burden of proof. But under the circumstances, an evidentiary hearing would have served no purpose. Because the court could not receive evidence regarding the jury's mental processes in reaching their verdicts (Evid. Code, § 1150), there exists no evidence outside of the trial record that may be used to assess which counts pertained to which incidents. For the same reason, remanding for an evidentiary hearing would be an idle act. Petitioner's double jeopardy claims must be analyzed solely upon the basis of the existing record.

### 1.  Count 13 (Caleb)

The prosecutor contended, and the trial court agreed, that retrial of count 13 was permissible because the prosecutor argued to the jury that count 13 pertained to the March 8 incident. Given this narrowing of focus, the issue petitioner seeks to preclude from being retried is whether he committed an act of forcible oral copulation on Caleb on March 8. Placing the burden of proof upon the prosecutor, the inquiry before us is whether the prosecutor showed that none of the acquittals (meaning the full acquittals in counts 7–10 and the acquittal of forcible oral copulation in count 6) was based upon the March 8 incident.

Count 13 alleged that petitioner committed an act of forcible oral copulation on Caleb between the dates of October 1, 2006, and March 8, 2007. If the prosecutor intended count 13 to pertain to the March 8 incident, the prosecutor could have alleged that this particular count occurred "on or about March 8, 2007," rather than between the dates of October 1, 2006, and March 8, 2007. March 8 was the day Caleb called the police to report the incidents, so there was no doubt about the date upon which the March 8 incident allegedly occurred. Had the prosecutor alleged that count 13 occurred on March 8, and the jury failed to reach a verdict on count 13, the uncertainty and confusion surrounding the permissibility of retrial would not exist, at least not in the form presented by the current record.

The prosecutor instead simply told the jury in argument that the prosecution's "mindset" was that count 13 pertained to the March 8 incident. But nothing required the jury to adopt that view of the charges. Neither the instructions nor verdict forms limited count 13 (or any other count) to the

events alleged to have occurred on March 8. Indeed, the court instructed the jury that counts 1 through 13 charged petitioner with "oral copulation with Caleb C. . . . sometime during the period of 10-1-06 to 3-8-07." It further instructed the jury that the attorneys' arguments were not evidence and that the court's instructions prevailed over argument. It is only through speculation that we could conclude that the jury adopted the prosecutor's argument and treated count 13 as pertaining to March 8. Had the court instructed the jury to do so, we could presume the jury followed that instruction, but the prosecutor's argument is not entitled to a comparable presumption. ■ As the United States Supreme Court has made clear, "speculation into what transpired in the jury room" should not play a part in double jeopardy analysis. (*Yeager, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2368].)

Although an election by a prosecutor will avoid the necessity of giving a jury a unanimity instruction where conviction on a single count could be based on two or more discrete criminal events shown by the evidence, the issue before us is not whether defendant's right to a unanimous verdict was protected. Here, we are concerned with defendant's right to avoid being placed twice in jeopardy and we must determine whether the jury necessarily based the acquittals on incidents other than the one on March 8, not whether the jury's acquittals were unanimous. Thus, we do not find that the prosecutor's purported "election," that is, his argument describing his "mindset" regarding one of 13 generically pleaded, indistinguishable counts, was of sufficient legal significance to dictate the outcome of the double jeopardy inquiry. In this regard, it is also important to note that the prosecutor argued not only his "mindset," but that the jury should either believe Caleb's testimony and conclude that it proved all 13 of the counts or disbelieve it and find it proved none of the counts. But the trial court instructed the jury that count 13 (along with counts 1–12) pertained to crimes allegedly committed between October 1, 2006, and March 8, 2007, and that the jury must follow the court's instructions rather than argument by the attorneys that conflicted with the instructions. Although the trial court believed the "election" was sufficient to defeat defendant's double jeopardy claim, it seemingly recognized the inherently speculative nature of its analysis, saying, "I can't say that the jury had the right to assume chronologically that the first act was count one and everything going up to count 13 is appropriate and say, well, the jury acquitted on counts 6 through 10, although they found a lesser on one, misdemeanor lesser, and that the D.A. should be entitled to retry counts 1 through 5 and 11 through 13." In light of the 13 identical charges covering the same interval of October 1, 2006, to March 8, 2007, the argument, the instructions, and, most important, the nature of the inquiry before us, we do not find the prosecutor's "mindset" argument sufficient to establish that the jury deemed count 13 to pertain to the March 8 incident.

Thus, the prosecutor has not shown, and cannot show, that none of the acquittals pertained to the March 8 incident. Double jeopardy precludes the retrial of count 13.

## 2. *Counts 19 through 22 (Kyle)*

Petitioner was acquitted of count 23, which alleged that on or between the dates of April 15, 2005, and March 2, 2007, petitioner committed the crime of continuous sexual abuse of a minor in violation of section 288.5, subdivision (a), by "unlawfully engag[ing] in three and more acts of 'substantial sexual conduct,' as defined in . . . section 1203.066(b), and three and more lewd and lascivious acts, as defined in . . . Section 288, with Kyle C., a child under the age of 14 years, while the defendant resided with, and had recurring access to, the child." The jury was instructed, in pertinent part, as follows: "The defendant is charged in Count 23 with continuous sexual abuse of a child under the age of 14 years in violation of Penal Code section 288.5(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant (lived in the same home with/ or had recurring access to) a minor child; [¶] 2. The defendant engaged in three or more acts of (substantial sexual conduct/ or lewd or lascivious conduct) with the child; [¶] 3. Three or more months passed between the first and last acts; [¶] AND [¶] 4. The child was under the age of 14 years at the time of the acts. [¶] . . . [¶] You cannot convict the defendant unless all of you agree that (he) committed three or more acts over a period of at least three months, but you do not all need to agree on which three acts were committed."

Counts 19 through 22 alleged that petitioner violated section 288, subdivision (b)(1), by committing lewd and lascivious acts upon Kyle "by use of force, violence, duress, menace, and threat of great bodily harm" on or between the dates of April 15, 2005, and March 2, 2007. The jury was instructed, in pertinent part, as follows: "The defendant is charged in Counts 19–22 with a lewd or lascivious act by force or fear on a child under the age of 14 years in violation of Penal Code section 288(b)(1). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1A. The defendant willfully touched any part of a child's body either on the bare skin or through the clothing; [¶] OR [¶] 1B. The defendant willfully caused a child to touch (his) own body, the defendant's body, or the body of someone else, either on the bare skin or through the clothing; [¶] 2. In committing the act, the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else; [¶] 3. The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of (himself) or the child; [¶] AND [¶] 4. The child was under the age of 14 years at the time of the act."

The prosecutor relied upon the same testimony to establish counts 19 through 22 and count 23. Although the elements required for a conviction in count 23 differed from those required for a conviction in counts 19 through 22, and it is possible to surmise that the jury found that Kyle's testimony that petitioner's acts began in the "summer" of 2006 and ended in the beginning of November was insufficient to prove beyond a reasonable doubt that petitioner's alleged acts against Kyle extended over a period of at least three months, such reasoning is necessarily based upon speculation, which, as we have repeatedly noted, the United States Supreme Court has forbidden. (*Yeager, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2368].) If the sole issue in contention regarding count 23 were whether the acts extended over a sufficient time period, it might not be speculative to conclude that the jury honed in on that element and to attribute the acquittal in count 23 to a failure of proof as to that element. But in actuality, the very occurrence of any of the acts to which Kyle testified was in controversy, and conflicting evidence supported each party's theory of the case.

In *Yeager, supra*, 557 U.S. at pages ___–___ [129 S.Ct. at pages 2368–2369], where the jury acquitted the defendant of many counts but could not reach verdicts on any of numerous insider trading charges, the Supreme Court framed the pertinent inquiry as follows: "[I]f the possession of insider information was a critical issue of ultimate fact in all of the charges against petitioner, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element." The equivalent inquiry here is whether the commission of a lewd or lascivious act (necessary to convict petitioner of counts 19–22) was an ultimate fact for count 23. The answer is yes. Although the jury could have convicted petitioner in count 23 if it found he committed either a lewd act or "substantial sexual conduct," the acquittal in count 23, viewed in the absence of speculation, means that the jury found that petitioner committed neither a lewd act nor substantial sexual conduct against Kyle during the applicable date range, which was the same range of dates alleged in counts 19 through 22. Count 23 included a broader range of acts than counts 19 through 22, and the acquittal embraces every type of act that potentially supported conviction of count 23.

We thus conclude that under *Yeager* double jeopardy precludes the retrial of counts 19 through 22.

In light of our conclusion regarding these counts, we need not address petitioner's contention regarding the effect of the prosecutor's violation of section 288.5, subdivision (c).

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its December 2, 2009 order denying petitioner's objection to retrial of count 13 and counts 19 through 22 and permitting a retrial of these counts. The order to show cause regarding the instant petition for a writ of mandate or prohibition issued on March 25, 2010, is discharged.

Rothschild, J., and Johnson, J., concurred.