Filed 6/11/20 (unmodified opn. attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ANDREW LOREN SANCHEZ,<br><br>        Defendant and Appellant. | F076908<br><br>(Super. Ct. No. 15CR03437)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on June 3, 2020, be modified in the following particulars:

1.      On page 14, footnote 9 is deleted, which will require renumbering of all subsequent footnotes.

There is no change in judgment.

Appellant's petition for rehearing is denied.


                                                                        DETJEN, Acting P.J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.

Filed 6/3/20 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>ANDREW LOREN SANCHEZ,<br><br>　　Defendant and Appellant. | F076908<br><br>(Super. Ct. No. 15CR03437)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County. Ronald W. Hansen, Judge. (Retired Judge of the Merced Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Byron C. Lichstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Andrew Loren Sanchez was charged with second degree murder (Pen. Code, § 187, subd. (a);[1] count 1), and assault on a child causing death (§ 273ab, subd. (a); count 2) in relation to the death of his nine-month-old son, M.R. A jury acquitted defendant of murder but could not reach a unanimous verdict on the lesser offense of involuntary manslaughter (§ 192, subd. (b)) or the assault charge in count 2. The court declared a mistrial as to those unresolved charges. The People moved to amend the information to add a charge of child endangerment with enhancements for personally inflicting great bodily injury. (§§ 273a, subd. (a), 969f, 12022.7, subd. (a).) The court permitted the amendment over defendant's objection and a first amended information was filed charging defendant with assault on a child causing death and child endangerment with enhancements for great bodily injury. Defendant then entered a *West* plea[2] to involuntary manslaughter and child endangerment with great bodily injury.[3] He was sentenced to a term of five years and, with credits, was released to parole the same day.

On appeal, defendant contends the People could not permissibly retry him on the amended information and he therefore should be permitted to withdraw his plea. He specifically argues the jury's acquittal on the murder charge resolved an ultimate factual issue common to the charge of assault on a child causing death, rendering retrial impermissible under collateral estoppel principles inherent in the bar against being twice put in jeopardy. He also argues the doctrine of vindictive prosecution barred the People

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     *People v. West* (1970) 3 Cal.3d 595.

[3]     The trial court issued a certificate of probable cause authorizing this appeal. (§ 1237.5; Cal. Rules of Court, rule 8.304(b).)

from adding a new charge of child endangerment with great bodily injury. Alternatively, defendant contends retrial on both charges was impermissible under section 654.

We hold: (1) the jury verdict of not guilty of murder (§ 187, subd. (a)) did not preclude, on collateral estoppel grounds, a second trial on assault on a child causing death (§ 273ab, subd. (a)) as the jury's verdict did not necessarily resolve an ultimate fact in defendant's favor as to the latter; (2) the People's amendment to the information to add a charge of child endangerment with enhancements for personally inflicting great bodily injury (§§ 273a, subd. (a), 969f, 12022.7, subd. (a)) did not give rise to a presumption of vindictiveness; and (3) section 654 did not preclude a subsequent trial on the first amended information. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[4]

On March 5, 2015, defendant's son M.R. was nine months old. M.R. was at home with defendant and defendant's three-year-old daughter from a prior relationship, A.M., when he suffered a significant head injury. M.R. was flown to a hospital, where he underwent brain surgery and died shortly thereafter. Defendant initially reported the injury occurred when M.R. fell two feet from A.M.'s bed onto a carpeted floor during a diaper change. Defendant later told A.M.'s mother that A.M. hit M.R. in the head while defendant was outside smoking a cigarette. As detailed below, the mechanism of M.R.'s injury was disputed at trial.

### *M.R.'s Birth and First Months*

Rebecca R. gave birth to M.R. following a 23-hour labor that included attempts at vacuum extraction and ended with a cesarean section. M.R. had no known medical issues at birth aside from a hearing issue, which resolved. He did not require special care and did not take medications.

---

[4] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

Rebecca and defendant were initially unsure of M.R.'s paternity, and defendant did not visit M.R. for three to four days after his birth. Defendant then took a paternity test that confirmed he was M.R.'s father.

After M.R. was born, Rebecca lived with her sister. Defendant initially visited infrequently, but later began staying with Rebecca more often. However, Rebecca's sister did not permit defendant to move in.

While Rebecca lived with her sister, M.R. fell three feet from Rebecca's bed onto a concrete floor that was covered with thin padding and carpet. This occurred on two separate occasions, when M.R. was four months old and six months old, respectively.

In mid-January 2015, Rebecca and defendant moved together to another location. Approximately two weeks prior to M.R.'s death, while at the new residence, M.R. again fell approximately three feet from a bed onto a carpeted floor. M.R. did not require medical attention following any of his falls.

At the time of his death, M.R. could laugh, smile, cry, crawl, and pull himself up to stand. He did not see a doctor from age four months until the day of his death.

Defendant would sometimes take care of M.R. on his own or with his mother, but would become frustrated when M.R. would cry. He also did not like Rebecca holding M.R. or picking M.R. up when he cried because defendant thought this conduct would make M.R. a "faggot," a "pussy," or "a bitch or gay." Defendant sometimes sent Rebecca text messages expressing his frustration with M.R. In one message sent in November 2014, defendant wrote, "This fucking kid won't shut the fuck up. Now my mom just got home. Changed him. And now he won't shut the fuck up." In another message sent in February 2015, defendant wrote, "Your son is being a straight bitch. Don't want food. Kept crying, so gave him a bottle. Left his light on so he didn't go to bed, and he puked so I gave him a bath. Now he's on the couch with me. He's chill now, but fuck, dude. Swear he's a damn bitch at least once a day."

4.

*The Date of the Incident*

On the morning of March 5, 2015, Rebecca fed M.R., changed his diaper, and put him down for a nap while defendant slept. She then got ready to go to school and woke defendant to help with the children. She packed a diaper bag for M.R. because she planned for him to go to a babysitter's house later that day while defendant and A.M. went to visit defendant's mother. When M.R. woke, Rebecca changed his diaper again and then left around 11:45 or noon, leaving M.R. in the care of defendant.[5] She returned to the house briefly to retrieve her lunch, then went to school to study. While at school, Rebecca had two unremarkable phone conversations with defendant.

At 2:08 p.m., defendant approached a man performing work outside the house and asked him to call 911 because M.R. fell off a bed and was barely breathing. At approximately 2:10 p.m., defendant called Rebecca and told her to come home because M.R. was hurt. Defendant then got on the phone with the 911 operator and stayed on the line until paramedics arrived. Defendant told the operator that M.R. had rolled off the bed and had clenched up in what defendant thought was a slight seizure. Defendant stated he had waited approximately one minute before calling 911 because he had attempted to perform CPR, although he was not CPR certified.

Meanwhile, Rebecca left school immediately following the call from defendant. When she arrived home, an ambulance was outside the house but emergency personnel had yet to go inside. Rebecca went inside and saw that M.R. was not breathing consistently. She asked defendant what happened, and he reported M.R. had fallen off A.M.'s bed.[6] He explained that he had turned away to get baby wipes and, when he turned back, M.R. was on the floor and was not crying. Rebecca went to M.R.'s side.

---

[5]    She placed both soiled diapers in a plastic bag hanging from a door in the kitchen that she used for garbage.

[6]    Detectives later determined the top off A.M.'s bed was two feet from the carpeted floor.

5.

A.M. was crying and defendant was "gathering things, and he kept going to [A.M.]" and "putting her in the room."

The paramedics arrived on scene at 2:23 p.m. They saw that M.R. was "posturing," which is a rhythmic movement of the arms or hands indicative of a head injury and massive internal bleeding. The posturing continued throughout the time the paramedics stayed with M.R. M.R. was wearing a diaper that was "securely and neatly fastened." A helicopter arrived at 3:10 p.m. and left at approximately 3:30 p.m. to take M.R. to the hospital.

Defendant refused to drive with Rebecca to the hospital on the ground he had to take care of A.M. Rebecca's brother eventually drove her to the hospital. Defendant took Rebecca's car and arrived at the hospital 30 to 40 minutes after Rebecca.

A CT scan revealed that M.R. had a subdural hematoma, also known as a blood clot, and M.R. had clinical signs his brain was beginning to herniate or be pushed out of the skull. The hospital's in-house pediatrician concluded that defendant's account of M.R. having fallen was inconsistent with the level of injury, which she described at trial as "the worst that [she] had ever seen." The pediatrician also conducted a standard review, which included an examination of M.R.'s eyes, and noted no abnormalities and no signs of external trauma.

A neurosurgeon was called to surgically evacuate M.R.'s hematoma. The surgeon removed a piece of M.R.'s skull and removed as much of the hematoma as he could. He also removed a piece of tissue that was part of the clot and sent it for pathology testing. There was active and severe bleeding within the brain. The surgical team attempted "typical maneuvers" to control the bleeding but M.R. kept hemorrhaging. The surgeon saw "a significant amount of bleeding" that appeared to be venous in nature, rather than arterial. This indicated either an open vein or some sort of damage to the sagittal sinus, where the veins drain through. The surgical team had difficulty controlling the bleeding, and could not determine whether M.R. had developed a blood clotting problem or

6.

whether there was a source of bleeding that could not be visualized.  M.R.'s brain was swelling, and the swelling worsened during the course of the surgery.  Because of the swelling, the surgeon removed part of the left frontal lobe of the brain.  The surgeon described M.R.'s injury as "horrific."

M.R. died soon after the surgery.

*After the Incident*

A few days after M.R.'s death, defendant removed all M.R.'s clothes, furnishings, toys, toiletries, and food from the home.  Rebecca was very depressed, and defendant mocked her for crying and lying in bed.  Defendant seemed to act "like it never happened."

After M.R.'s death, defendant added details to his account of how M.R. fell.  For example, although defendant initially told Rebecca A.M. was in the living room when M.R. fell, he later told Rebecca A.M. was in the bedroom when M.R. fell, and she yelled, "Daddy, look at my nails."  Defendant claimed he turned to look at A.M.'s nails and, when he turned back, M.R. was on the floor.  At another point, defendant told Rebecca that he turned away to get more wipes because M.R. had feces on his leg.  After M.R.'s funeral, Rebecca asked defendant what he had done with M.R.'s soiled diaper. Defendant told her that he threw it in an empty Capri Sun drink box near the washer and dryer.  This raised suspicion for Rebecca because she knew that the only Capri Sun box in the house at that time was in the refrigerator with drinks inside.[7]  Rebecca asked defendant whether A.M. had accidentally hurt M.R. but defendant denied that she had.

Detectives worked with A.M.'s mother, Mollie G. to interview A.M. but A.M. was unable to provide useful information.  Later, in mid-April, Mollie contacted law enforcement to report that defendant told her his first interview with police was a lie and

_____

[7]    Photographs of the home taken by law enforcement immediately after the incident showed a Capri Sun box in the refrigerator and two soiled diapers in the trash bag that Rebecca had described using earlier that morning.

that A.M. was responsible for M.R.'s death.  Law enforcement then arranged for Mollie to make several recorded pretext phone calls to defendant in which defendant claimed A.M. had hit M.R. in the head, possibly with M.R.'s bottle, while defendant was outside smoking a cigarette.  Defendant stated that he told A.M. to say that M.R. fell off the bed.  Defendant also stated that he waited approximately nine minutes before calling 911.

During the recorded phone calls, defendant also told Mollie that he had changed M.R. on the floor and M.R. had never been on the bed.  He additionally stated that M.R.'s brain was being sent for testing to determine whether his injuries were from shaking or some kind of impact, and defendant was hopeful A.M. "just hit [M.R.] or something like that to where there's no kind of impact."  At another point however, defendant stated, "I'm hoping like she did hit him and then the that [*sic*] caused the pressure on the brain because then that would be the cause of the fall."

Defendant explained to Mollie that he had learned from speaking with attorneys and relatives that A.M. would face no consequences for these actions, and the only possible consequence was that defendant would lose his custodial rights.  However, defendant claimed he had been told not to tell the truth to law enforcement yet, and urged Mollie not to go to law enforcement because his lawyer would tell the police the truth in order to have the matter "settled in a different way versus  [¶] . . . [¶]  . . . [g]oing to court . . . ."

At the time of the incident, A.M. weighed 30 pounds, was the smallest in her class, and could not lift a gallon of milk.

### Medical Evidence

#### Dr. Mark Super

Dr. Mark Super is a forensic pathologist and he testified for the People regarding the autopsy he performed on M.R.  He noted M.R. was in the bottom 15th percentile for height and the bottom fifth percentile for weight, but his head was within expected range for his age.

Super saw that part of M.R.'s skull had been removed during surgery and a subdural hematoma had been suctioned out. However, subdural hemorrhage had reaccumulated on the left side. There was an accumulation of blood forming a mass between the scalp and the skull, primarily over the back of the head surrounding the hole in the skull. There were acute hemorrhages in the subarachnoid space. There were bruises on M.R.'s brain and evidence of possible impact in the skin at the back of his head.

Super removed the brain for examination by a neuropathologist, Dr. Bennet Omalu. According to Super, Omalu found diffuse traumatic axonal injury, which is a microscopic finding suggesting very serious traumatic injury in the white matter of the brain. According to Super, these findings result from shear forces jostling the brain inside the skull, shearing the veins and causing them to bleed. Super opined that both the diffuse traumatic axonal injury and the subdural hematoma caused M.R.'s brain to swell.

Super opined that the cause of M.R.'s death was blunt impact head injuries, and the manner of death was homicide. Given the severity of M.R.'s injuries, Super found defendant's explanation of a fall from a bed to be "a really bogus explanation." In Super's opinion, M.R.'s injuries were willfully inflicted, rather than accidental. Super opined that M.R. had been slammed against some surface, likely, but not necessarily, a soft surface like a bed or sofa, which would not cause a bruise. He explained that M.R. may have been thrown or swung by his legs onto such a surface. Super did not see any marks that would indicate M.R. was hit with an object or weapon, although he acknowledged it was possible. Super did not believe M.R.'s injury could have been inflicted accidentally or by a three-year-old hitting M.R. in the head with a baby bottle.

Super also opined that M.R.'s injuries were not the result of him having fallen from a bed multiple times on prior occasions. Super was aware of second impact syndrome, in which a second fall may cause a more serious injury than otherwise would be expected, but he saw no evidence M.R. had a prior injury that would cause such a

9.

result.  Super explained that a person who sustains a head injury resulting in subdural hematoma may develop a thin neomembrane that helps heal the brain by absorbing the hematoma.  During that healing process, the neomembrane develops capillaries that are delicate and that could rupture with a second impact.  Super did not see a neomembrane or evidence of a prior healed, or partially healed, subdural hematoma in M.R.'s brain.

Super did not think the tissue sent to pathology by the neurosurgeon was a neomembrane.  He explained the tissue was fibrous, about the size of an eraser head, and looked like it might be dura mater.  Furthermore, even if it was a neomembrane, it was too small to be significant.

On cross-examination, Super acknowledged studies indicating a subdural hematoma can result from a short fall and that shaken baby syndrome cannot be inferred solely from the presence of subdural hematoma or hemorrhage.  He also acknowledged that subdural hematomas can result from vigorous labor.

### *Dr. Bennet Omalu*

Dr. Bennet Omalu is the chief medical examiner for San Joaquin County, president of his own pathology consulting corporation, and a clinical professor of pathology at the University of California at Davis.  He is board certified in forensic pathology and neuropathology.  He testified as an expert for the People.

When Omalu examined M.R.'s brain he saw a constellation of signs of very severe trauma in his brain, eyeball, and dura mater.  M.R. had bleeding on both sides of the dura mater and in between the two sides of the brain.  To Omalu, this indicated M.R.'s head was exposed to significant force in the form of angular rotational acceleration/deceleration, whether being hit by an object or slammed on a surface.  He explained that a fall from a height would instead expose the brain to linear acceleration/deceleration.

This bleeding caused Omalu to look for other signs that would be expected to accompany such trauma, such as swelling, vascular injury, membrane injury, and axonal

10.

injury. Omalu subjected M.R.'s brain tissue to amyloid precursor protein immunohistochemistry analysis (APP), which was positive for diffuse axonal injury. According to Omalu, diffuse axonal injury is indicative of "high scale severe brain trauma."

Omalu also saw bilateral subarachnoid hemorrhages, excito toxic injury (which is indicative of a traumatic membrane injury), and laceration of the bridging vein with contusions surrounding the lacerated vein. Omalu also saw signs of globular retinal hemorrhage in M.R.'s eye, which Omalu explained is typically seen in cases involving trauma with angular rotational acceleration/deceleration.

According to Omalu, it was not likely these injuries resulted from a two-foot fall onto a carpeted floor because such a fall would not have generated sufficient "G-Force[s]" or angular rotational acceleration/deceleration. He characterized this explanation as "[i]mplausible, if not impossible." He also stated M.R.'s injuries likely could not have been caused by a three-year-old. Instead, the force required to generate such injuries could only be generated by an adult. Furthermore, massive bleeding on both sides of M.R.'s scalp indicated the back of his head sustained at least one massive, high-scale impact.

Omalu did not see any evidence of prior traumatic brain injury. There was some evidence of prior homocysteine leading histiocytes, which Omalu characterized as "part of daily life" and not indicative of prior trauma. As far as the tissue the neurosurgeon removed from M.R.'s brain, which the surgeon referred to as membranous tissue, Omalu examined the tissue and determined it was normal dura mater.[8] There was no blood in the specimen and it was not indicative of a prior bleed. It was not a neomembrane.

---

[8]     On cross-examination, Omalu acknowledged that he did not review this specimen until shortly before trial.

### Dr. Carl Wigren

Dr. Carl Wigren is a forensic pathologist who testified on behalf of the defense. He explained that he was trained that subdural hematoma, retinal hemorrhage, and cerebral edema were indicative of abusive head trauma. However, since 2013, he had attended several conferences and read studies in which he learned this may not always be the case, and that the studies he previously relied on were flawed.

Wigren opined that a short fall could cause the type of injuries M.R. sustained. Wigren found significant M.R.'s history of prior falls and his "traumatic" birth. According to Wigren, 46 percent of newborns have subdural hematomas at birth. Up to 75 percent of newborns who endure a long labor with vacuum extraction have a subdural hematoma. A small percentage of these newborns may develop a chronic process with continued bleeding of the hematoma.

Furthermore, Wigren noted rapid growth in M.R.'s head circumference. When M.R. was born, his head circumference was in the 36th percentile. However, at two-and-a-half months, his head circumference was in the 81st percentile, and at 4.7 months old, his head circumference was in the 77th percentile. The jump from 36th percentile to 81st percentile could indicate a pathology in the head.

Wigren opined that M.R. likely formed a subdural hematoma at birth. Wigren explained that a healing hematoma will develop a neomembrane with an ingrowth of blood vessels that can bleed briskly if reinjured. Thus, M.R.'s first fall would have ruptured the healing neomembrane. His second and third falls also very likely could have caused another rebleed. With M.R.'s fourth and fatal fall, the bleeding may have exceeded the volume of the head and caused the brain to begin herniating, which in turn caused cerebral edema.

Wigren used a microscope to examine a stained cut of the tissue that was removed from M.R.'s brain by the neurosurgeon, and concluded it was part of a healing neomembrane. Wigren contacted a neuropathologist, Dr. Roland Auer, who asked

12.

Wigren to perform a specialized analysis called "CD31." The slides of the CD31 test revealed the tissue sample was full of tiny blood vessels. This confirmed to Wigren that the tissue was a healing neomembrane, not dura. Wigren presented the jury with a PowerPoint presentation with images of the slides, detailing how and why the tissue sample constituted a neomembrane.

Wigren also found it significant that the pediatrician who examined M.R. in the hospital did not note the presence of any retinal hemorrhages. Accordingly, Wigren opined that the retinal hemorrhages Omalu saw later were a result of cerebral edema or blood thinning issues that occurred during surgery. Wigren also opined that the APP test performed by Omalu showed only that there were damaged neurons. However, this may have been a false positive for diffuse axonal injury because the same results could be caused by brain swelling and loss of oxygen.

Wigren did not think shaking was the mechanism of M.R.'s injuries because there was no injury to his neck and because the pediatrician did not see retinal hemorrhaging when M.R. was admitted to the hospital. He did not think slamming against a hard surface was the mechanism of injury because he did not see any impact area. He believed it was implausible that A.M. could have caused the injury. He acknowledged it was possible that slamming against a soft surface was the mechanism of injury. However, he opined that a two-foot fall could have caused M.R.'s injuries, particularly with his history of prior falls.

On cross-examination, Wigren acknowledged that the neomembrane is made up of small capillaries, but that the severe venous bleeding described by the neurosurgeon likely would not be coming from capillaries. In other words, the rupture of a single healing neomembrane was not the source of the severe hemorrhage.

### *Dr. Chris Van Ee*

Dr. Chris Van Ee is a biomechanical engineer who testified on behalf of the defense. He has studied skull fractures in children and the types of forces and

13.

accelerations that give rise to fatal head injuries in children. Van Ee opined that M.R.'s injuries could have been caused by a two-foot fall from a bed, particularly in combination with a preexisting injury. Van Ee disagreed with Omalu's assessment that a fall only produces linear acceleration. According to Van Ee, a fall can produce both a linear and angular response and can produce shear forces at the surface of the brain. Van Ee also disagreed with Super's assessment that M.R.'s injuries likely resulted from being slammed onto a soft surface, because a soft surface would reduce the chance for injury. However, he acknowledged the injury could have resulted from being slammed against a lightly padded surface, like the arm of a sofa. Ultimately, he could not rule out abuse and stated, "I don't know what happened."

## DISCUSSION

### I.      Retrial for Assault on a Child Causing Death

At some point after trial, defendant objected to retrial on the assault count on the ground that the jury's acquittal on the murder count necessarily involved adjudication in defendant's favor of a fact required for conviction on the assault count, specifically, the question of whether defendant committed an act that resulted in M.R.'s death.[9]

The court found the acquittal did not necessarily involve jury findings in defendant's favor on all the elements of assault on a child resulting in death. Ultimately, the court found it plausible that the jury found in defendant's favor on the murder count on the ground defendant did not have the required mental state, which differs from the mental state required for assault on a child resulting in death.

Defendant contends the trial court erred in permitting retrial on the charge of assault on a child causing death. We disagree.

---

[9]      The objection itself is not contained in the record on appeal, although the record does contain the People's opposition.

14.

## A. Applicable Law

The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that no person may be tried more than once for the same offense. (*People v. Anderson* (2009) 47 Cal.4th 92, 103-104.) The double jeopardy clause thus " 'protects against a second prosecution for the same offense following an acquittal or conviction, and also protects against multiple punishment for the same offense.' " (*Ibid.*; accord, *North Carolina v. Pearce* (1969) 395 U.S. 711, 717 (*Pearce*), overruled on other grounds by *Alabama v. Smith* (1989) 490 U.S. 794; see §§ 656, 687.)

This bar generally only prevents repeated prosecution based on " 'the same identical act *and* crime.' " (*Currier v. Virginia* (2018) ___ U.S. ___ [138 S.Ct. 2144, 2153] (*Currier*).) Thus, to prevent a second trial, the defendant generally must show an identity of statutory elements between the former and current charges against him. (*Ibid.*; *Blockburger v. United States* (1932) 284 U.S. 299, 304.) However, in narrow circumstances where two offenses involve a common issue of ultimate fact, "the retrial of an issue can be considered tantamount to the retrial of an offense," even if the elements of the two offenses differ. (*Currier*, *supra*, 138 S.Ct. at p. 2153; see *Ashe v. Swenson* (1970) 397 U.S. 436, 443-444 (*Ashe*); *Yeager v. United States* (2009) 557 U.S. 110, 119-120 (*Yeager*).) This principle is derived from the doctrine of collateral estoppel, which provides that when "an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (*Ashe*, at p. 443; accord, *Yeager*, at p. 119.)

In the criminal context, the test for establishing a bar against retrial based on collateral estoppel "is a demanding one." (*Currier*, *supra*, 138 S.Ct. at p. 2150.) "To say that the second trial is tantamount to a trial of the same offense as the first and thus forbidden by the Double Jeopardy Clause, we must be able to say that 'it would have been *irrational* for the jury' in the first trial to acquit without finding in the defendant's

favor on a fact essential to a conviction in the second." (*Ibid.*) In other words, a second trial is prohibited only if conviction would require the prosecutor to prevail on a factual issue the jury *necessarily* resolved in the defendant's favor in the first trial. (*Yeager*, *supra*, 557 U.S. at p. 123; *Currier*, *supra*, 138 S.Ct. at p. 2150.) It is not sufficient that the jury *likely* acquitted based on the factual issue in question. (*Currier*, *supra*, 138 S.Ct. at p. 2150.)

That said, we do not apply the "hypertechnical and archaic approach of a 19th century pleading book." (*Ashe*, *supra*, 397 U.S. at p. 444.) Instead, we must " 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " (*Ibid.*, fn. omitted; accord, *Brown v. Superior Court* (2010) 187 Cal.App.4th 1511, 1524 (*Brown*).) In assessing which matters the jury necessarily decided, we are confined to " 'the points in controversy on the former trial, to the testimony given by the parties, and to the questions submitted to the jury for their consideration.' " (*Yeager*, *supra*, 557 U.S. at p. 122; accord, *Brown*, at p. 1524.) We derive no import from counts on which the jury hung in the first trial. (*Yeager*, at p. 122; *Brown*, at p. 1524.) "The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' " (*Ashe*, *supra*, 397 U.S. at p. 444; accord, *Brown*, *supra*, 187 Cal.App.4th at p. 1524.) Our "ultimate focus remains on the practical identity of offenses," i.e., whether a second trial amounts, in practical terms, to a retrial for the same offense. (*Currier*, *supra*, 138 S.Ct. at p. 2153.)

It is the defendant who bears the burden of establishing facts to prove that a previously rendered judgment of acquittal bars retrial based on double jeopardy principles.[10] (*Brown*, *supra*, 187 Cal.App.4th at p. 1525; *Bravo-Fernandez v. United*

---

[10] Defendant relies on *Brown* for the proposition that the People bear the burden of proof and that he must make only a prima facie "nonfrivolous showing that he faces

16.

*States* (2016) 580 U.S. ___ [137 S.Ct. 352, 365] [defendants bear the burden of showing that the ultimate issue has been " 'determined by a valid and final judgment of acquittal' "]; accord, *People v. Burkhart* (1936) 5 Cal.2d 641, 643.)  We review the trial court's resolution of any disputed facts for substantial evidence.  (See *People v. Batts* (2003) 30 Cal.4th 660, 682-683.)  The court's legal determination on the question of former jeopardy is a question of law that we review de novo.  (See *People v. Davis* (2011) 202 Cal.App.4th 429, 438; *In re Corrine W.* (2009) 45 Cal.4th 522, 529 [on appeal, questions of law are reviewed de novo].)

Several cases illustrate the application of the collateral estoppel bar.  *Ashe* involved the robbery of six poker players and the theft of a car.  (*Ashe*, *supra*, 397 U.S. at p. 437.)  The defendant was charged with seven separate offenses:  one for each of the robberies of the six victims and one for the theft of the car.  (*Id.* at p. 438.)  He first was tried for the robbery of only one of the poker players and was acquitted.  (*Id.* at pp. 438-439.)  The prosecution then brought the defendant to trial again for the robbery of another of the poker players, and he was found guilty.  (*Id.* at pp. 439-440.)  The United States Supreme Court reversed.  (*Id.* at p. 447.)  The court noted that the first jury could not rationally have found, based on the evidence, that an armed robbery had not occurred or that the poker player at issue had not been a victim.  (*Id.* at p. 445.)  Thus, the only conceivable issue in dispute in the first trial was whether the defendant had been one of the robbers, an issue the jury determined in defendant's favor.  (*Id*. at pp. 445-446.)

---

prosecution for an offense for which he was formerly placed in jeopardy." (*Brown*, *supra*, 187 Cal.App.4th at p. 1528.)  This rule, articulated in *Brown*, applies in the "unique" situation where the prosecutor charges multiple identical counts without specifying in the information, instructions, or verdict forms the specific act on which each count is based, making it uncertain which incidents pertained to which counts and therefore uncertain as to which incidents the defendant had already been convicted or acquitted of committing. (See *id.* at pp. 1525-1530.)  Absent such unique circumstances, however, *Brown* confirms that the burden of proof remains with the defendant. (*Id.* at p. 1525; see *People v. Smith* (2005) 132 Cal.App.4th 1537, 1548-1549.)

Accordingly, the court held the government was constitutionally barred from pursuing a second prosecution as to another of the victims in the hope a different jury might find the evidence of the defendant's involvement more convincing. (*Id.* at p. 446.)

In *Yeager*, the defendant was tried on charges of fraud and insider trading. (*Yeager*, *supra*, 557 U.S. at p. 114.) The jury acquitted him of the fraud counts but failed to reach a verdict on the insider trading counts. (*Id*. at p. 115.) After the government recharged the defendant with some of the insider trading counts, the defendant moved to dismiss on the ground the jury's acquittals on the fraud counts "had necessarily decided that he did not possess material, nonpublic information" (*ibid*.) about a project at the heart of both the fraud and insider trading counts. (*Id*. at pp. 113-115.) The Court of Appeals concluded the jury *did* make such a determination, but also concluded that a rational jury reaching this determination would have acquitted the defendant on the insider trading counts, rather than being unable to reach a verdict. (*Id*. at p. 116.) Because the jury instead hung on the insider trading counts, the Court of Appeals was left uncertain as to what the jury necessarily determined. (*Ibid.*) On review, the high court held that a hung count is not a relevant part of the collateral estoppel analysis, as there is no way to decipher what it represents; attempts to draw meaning from a hung count amount to no more than "guesswork," "conjecture," and "speculation" as to what transpired in the jury room. (*Id*. at pp. 121-122.) The United States Supreme Court therefore remanded for the lower court to resolve whether possession of insider information was a critical issue of ultimate fact in all the charges against the defendant, and whether the jury's verdict in the first trial necessarily decided that issue in defendant's favor, irrespective of the first jury having hung on the insider trading counts. (*Id*. at pp. 123, 126.)

In *Brown,* the defendant was charged, in relevant part, with four counts of committing a forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1)) over approximately a two-year period, and one count of continuous sexual abuse (§ 288.5,

subd. (a)) during the same timeframe. (*Brown*, *supra*, 187 Cal.App.4th at p. 1514.) The counts all involved the same victim, and the prosecutor presented the continuous sexual abuse charge as an " 'alternative' " to the forcible lewd act charges, given that the continuous sexual abuse was made up of the same acts underlying the forcible lewd act counts. (*Id*. at p. 1522.) Ultimately, the jury acquitted the defendant of the continuous sexual abuse count but hung on the forcible lewd act counts. The trial court held that retrial on the forcible lewd act counts was permissible. (*Id*. at p. 1523.)

On appeal, the court concluded the prosecutor bore the burden of establishing by a preponderance of the evidence that the charges to be retried involved different offenses than those the defendant had already been acquitted of committing.[11] (*Brown*, *supra*, 187 Cal.App.4th at p. 1529.) The court began its analysis with the elements of the respective offenses, noting, in pertinent part, that continuous sexual abuse of a child requires three or more lewd and lascivious acts over at least a three-month period, and forcible lewd acts require the commission of a lewd and lascivious act by use of force, violence, duress, menace or threat. (*Id*. at p. 1531.) The court also noted that the question of whether any of the alleged acts had occurred was in controversy at trial. (*Id*. at p. 1532.) Ultimately, the court surmised that the commission of a lewd and lascivious act was an ultimate fact necessary for the charge of continuous sexual abuse, and the jury's verdict of acquittal on that count meant that the jury found the defendant did not commit any lewd act against the victim during the relevant time period. (*Ibid*.) According to the *Brown* court, "the acquittal embrace[d] every type of act that potentially supported conviction" of continuous sexual abuse, and retrial with respect to the forcible lewd acts was therefore barred. (*Ibid*.)

---

[11] As explained above, the instant case is not similarly postured to *Brown* and, here, it is defendant who bears the burden of proving he has been twice placed in jeopardy by reason of a prior acquittal. (See *ante*, fn. 10.)

**B.    Analysis**

As in *Brown*, we begin our analysis with an examination of the statutory elements of the relevant offenses.  (*Brown*, *supra*, 187 Cal.App.4th at p. 1531.)  Defendant was acquitted of the offense of murder.  Murder is an unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Thus, to commit murder, the defendant must (1) commit an act that caused the death of another person, (2) with malice aforethought, and (3) without lawful excuse or justification.  (*People v. Navarette* (2016) 4 Cal.App.5th 829, 843.)  Here, the People proceeded on a theory of implied malice, which required the People to establish that the defendant "(1) intentionally committed an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time he acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life."  (*Id*. at pp. 843-844.)

The People sought to retry defendant for assault on a child resulting in death.  Assault on a child resulting in death requires a showing that (1) the defendant had care or custody of a child under eight years old, (2) the defendant did an act that by its nature would directly and probably result in the application of force to the child, (3) the defendant did that act willfully, (4) the force used was likely to produce great bodily injury, (5) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in great bodily injury to the child, (6) when the defendant acted, he had the present ability to apply force likely to produce great bodily injury to the child, and (7) the defendant's act caused the child's death.  (§ 273ab; see *People v. Wyatt* (2012) 55 Cal.4th 694, 702; *People v. Albritton* (1998) 67 Cal.App.4th 647, 657-658; CALCRIM No. 820.)

Certainly, the most hotly contested issue at trial was whether defendant did *any* specific act that caused M.R.'s death, an issue common to the elements of both offenses.  The People's experts opined that M.R.'s injuries resulted from a forceful, inflicted injury, such as the child being slammed against a surface by being thrown or swung by an adult.

20.

These experts rejected as implausible defendant's explanation that M.R. fell from the bed onto a carpeted floor. However, the defense experts opined there was no evidence of non-accidental injury, and theorized the injuries could have been caused by a short fall. Closing arguments were similarly divided: the prosecutor argued the evidence showed defendant had slammed M.R.'s head against something, while defense counsel argued the injuries could have been accidental.

In acquitting defendant of murder, it is conceivable the jury concluded M.R.'s injuries resulted from an accidental fall and rejected in its entirety the People's theory that M.R. had been slammed, or at least concluded the People had not proved this mechanism of injury beyond a reasonable doubt. Such a finding would mean that the jury found in defendant's favor on an issue of ultimate fact necessary for conviction of assault on a child causing death. However, for purposes of collateral estoppel, it is not enough that such a finding was conceivable, or even likely. (*Currier*, *supra*, 138 S.Ct. at p. 2150.) Only if the jury *necessarily* made such a finding may we conclude that retrial for assault on a child causing death is barred.

To determine whether the jury necessarily made such a finding, we must look at the other elements of the offense of murder and determine, in light of " 'the points in controversy on the former trial, . . . the testimony given by the parties, and . . . the questions submitted to the jury for their consideration,' " (*Yeager*, *supra*, 557 U.S. at p. 122; accord, *Brown*, *supra*, 187 Cal.App.4th at p. 1524), whether it would have been irrational for the jury to acquit without finding in defendant's favor on this issue. (See *Currier*, *supra*, 138 S.Ct. at p. 2150.) As we explain, we cannot conclude that the jury necessarily made such a finding.

In evaluating the murder count, the jury was also asked to determine whether defendant acted with subjective disregard for human life.[12] Indeed, the prosecution spent

---

[12]     This differs from the state of mind required for assault on a child causing death, which requires that the defendant be aware of facts that would lead a reasonable person to

21.

significant time in closing argument discussing the states of mind required for each of the offenses, and argued that a risk of death or great bodily injury was obvious from defendant's conduct which, according to the prosecution, likely involved slamming M.R.'s head against something like the floor. This was consistent with the testimony of the People's experts, who opined M.R.'s injuries likely resulted from significant, adult-inflicted force. However, the People's experts also opined that the injuries were consistent with M.R. being slammed against a soft or padded surface, and the jurors reasonably could have deduced that defendant did not know such conduct was dangerous to human life, particularly in light of defense testimony indicating that a soft surface would reduce the chance of injury. Furthermore, the defense experts likewise opined that the injuries could have resulted from being slammed against a soft or padded surface, and that M.R. had risk factors suggestive of prior brain injury that would have made him more susceptible to reinjury, even with a less forceful blow. Because the evidence regarding the mechanism of injury and the degree of force required was conflicting, it is conceivable the jurors, or at least some of them, determined that the People proved defendant committed an act that resulted in M.R.'s death, but that he had not done so with subjective disregard for human life. Such a finding would not bar retrial on the charge of assault on a child causing death.

Nevertheless, defendant contends we should not consider whether the jury may have decided the murder count based on defendant's state of mind because the "real" dispute at trial was whether M.R. was injured by a fall or by abuse. In this vein, defendant contends that subjective disregard for human life is merely a technical element of the offense, and not a matter that was actually, practically in dispute at trial. He contends that "[t]he amount of force had nothing to do with malice." However, the

realize that his act by its nature would directly and probably result in great bodily injury to the child. (§ 273ab, subd. (a).)

amount of force used may have been critical to the jury's determination of malice, as it would be difficult to assess whether a defendant knew his conduct was dangerous to human life without knowing the nature and extent of such conduct. Thus, while we agree that the mechanism of M.R.'s injury was the primary dispute at trial, it was not the only dispute.

Finally, defendant relies on *Brown* to argue that a technical, abstract distinction between the elements of two offenses is not relevant to the collateral estoppel argument if those elements were not in dispute at trial. (See *Brown*, *supra*, 187 Cal.App.4th at p. 1532.) He points out that the *Brown* court disregarded elements of the offense that were not in dispute. In *Brown*, however, the posture of the case required the court to consider whether the *government* met its burden of showing retrial was not barred. (*Id.* at pp. 1527-1528.) Here, it is *defendant* who bears the burden of demonstrating collateral estoppel bars retrial. (*Id.* at p. 1525.) In any event, we disagree that the element of malice was not in dispute in this case for the reasons stated above.

In sum, the jury reasonably could have grounded its verdict upon the issue of defendant's state of mind. We therefore cannot say it would have been irrational for the jury to acquit defendant of murder without finding he had not committed an act that caused M.R.'s death. (See *Currier*, *supra*, 138 S.Ct. at p. 2150.) Because the jury did not necessarily decide this issue in defendant's favor in the first trial, the collateral estoppel principles inherent in the double jeopardy clause do not bar retrial on the count of assault on a child causing death. (*Yeager*, *supra*, 557 U.S. at pp. 122-123 & fn. 6; *Currier*, *supra*, 138 S.Ct. at p. 2150.)

## II.     New Charge of Child Endangerment and Vindictive Prosecution

After the jury acquitted defendant of murder and hung on the counts of involuntary manslaughter and assault on a child causing death, the People moved to amend the information to add a charge of child endangerment with enhancements for personally inflicting great bodily injury. The court granted the motion, and the People

filed an amended information charging defendant with assault on a child causing death and child endangerment with great bodily injury. Defendant contends the addition of the child endangerment charge raised a presumption of vindictive prosecution that the People did not, and could not, rebut. As we explain, we find the amendment did not raise a presumption of vindictive prosecution.

### A.    Additional Factual Background

After the court declared a mistrial, the prosecutor stated the People would have a decision by the following week regarding how they wished to proceed in the matter. Thereafter, the parties attended a trial setting conference and two readiness conferences. A few weeks before retrial was set to commence, the People moved to amend the information to add a charge of felony child endangerment, with enhancements for great bodily injury. Defendant opposed the motion, and moved to dismiss the charge for vindictive prosecution.

When the motion came on for hearing, defense counsel argued the amendment raised a presumption of vindictiveness because it increased defendant's exposure to potential prison time. The People argued there was no presumption of vindictiveness because there was no "real increase in exposure." Additionally, the prosecutor stated:

> "But, also, the amendment was made after the fact that he has been asserting his right to a trial for a while. This wasn't something that they were one after the other in conjunction with another. This amendment was done before the next trial after negotiations broke down."

The prosecutor further argued any presumption had been rebutted because "new evidence came out at the first trial that was not aware to the prosecutor at the time that the initial charges were filed," specifically "expert reports and testimony" the People were unaware of until the defense witnesses took the stand.

The court ruled that the defense theory was "a fall from the bed could cause the injury" and that theory raised the issue of child endangerment, "which didn't arise before." The court continued:

24.

"And with all that information after hearing the trial, the case probably should have been charged as a child endangerment charge. That's the proper charge in this case after hearing the defense's experts in this matter. So I do find that there is good reason to change the theory of the case."

Defense counsel then pointed out that "that entire theory was based in large part on the defendant's own statements that were gleaned from the investigation done by the prosecution and their investigators" and "[t]he expert reports were turned over well in advance of trial." The court noted, however, that Wigren's diagrams showing the presence of a neomembrane had not been turned over prior to trial, and that they added a "convincing" element to the defense theory. Accordingly, the court determined the amendment was permissible.

After the court granted the People's motion to amend and denied defendant's motion to dismiss the charge of assault on a child causing death based on collateral estoppel, the court queried whether the parties wished to settle the case. The People stated, "We've offered five years at 50 percent. I'm not sure if [defense counsel] has had a chance to discuss that with her client." Defense counsel questioned whether that was a formal offer and, when the prosecutor responded affirmatively, requested time to discuss the matter with her client. However, defendant interjected that he did not wish to accept the offer. Accordingly, the parties proceeded to trial scheduling matters.

Defendant entered a plea of no contest the following day.

**B.     Applicable Law**

Section 1009 governs the amendment of accusatory pleadings. It provides, in relevant part, that "[t]he court in which an action is pending may . . . permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceedings . . . ." (§ 1009.) Generally speaking, courts have construed section 1009 as allowing the addition of new charges after a mistrial. (*Short v. Superior Court* (2019) 42 Cal.App.5th 905, 913 (*Short*).)

25.

However, the due process clauses of both the federal and state Constitutions prohibit the People from increasing charges against a criminal defendant in retaliation for the defendant's exercise of a constitutional right. (*People v. Jurado* (2006) 38 Cal.4th 72, 98.) "A vindictive prosecution claim may be established ' "by producing direct evidence of the prosecutor's punitive motivation." ' " (*Short, supra*, 42 Cal.App.5th at p. 915, quoting *U.S. v. Brown* (9th Cir. 2017) 875 F.3d 1235, 1240; accord, *United States v. Goodwin* (1982) 457 U.S. 368, 380-381, 384 (*Goodwin*).) In the absence of such direct evidence, a defendant may raise a presumption of vindictiveness by making a prima facie showing that the prosecutor's actions raise a "reasonable likelihood of vindictiveness." (*Twiggs v. Superior Court* (1983) 34 Cal.3d 360, 373 (*Twiggs*); accord, *Goodwin*, at p. 373.) "In order to rebut the presumption of vindictiveness, the prosecution must demonstrate that (1) the increase in charge was justified by some objective change in circumstances or in the state of the evidence which legitimately influenced the charging process and (2) that the new information could not reasonably have been discovered at the time the prosecution exercised its discretion to bring the original charge." (*In re Bower* (1985) 38 Cal.3d 865, 879 (*Bower*); accord, *Blackledge v. Perry* (1974) 417 U.S. 21, 29, fn. 7.)

"[A]n inference of vindictive prosecution is raised if, upon retrial after a successful appeal, the prosecution increases the charges so that the defendant faces a sentence potentially more severe than the sentence he or she faced at the first trial." (*People v. Ledesma* (2006) 39 Cal.4th 641, 731; accord, *Pearce, supra*, 395 U.S. at pp. 713, 723-726.) Similarly, under California law, a presumption of vindictiveness is raised where the prosecutor adds additional charges, which subject the defendant to greater potential liability, after a mistrial. (*Bower, supra*, 38 Cal.3d at p. 873 [finding reasonable likelihood of vindictiveness where charges are increased following mistrial resulting from impermissible testimony by prosecution witness]; *Twiggs, supra*, 34 Cal.3d at pp. 368-370 [finding reasonable likelihood of vindictiveness where charges are

26.

increased following mistrial due to deadlocked jury]; but see *U.S. v. Thomas* (10th Cir. 2005) 410 F.3d 1235, 1247 [addition of charges due to mistrial following a hung jury does not raise presumption of vindictiveness]; *U.S. v. Khan* (2d Cir. 1986) 787 F.2d 28, 32-33 [no realistic likelihood of vindictiveness where the parties agree a mistrial is necessary due to deadlocked jury].)

Our Supreme Court has not clarified the standard of review for a claim of vindictive prosecution. (See *People v. Ayala* (2000) 23 Cal.4th 225, 299 [rejecting the defendant's claim of vindictive prosecution "under any standard of review"].) We, like other Courts of Appeal, will review the trial court's factual findings for substantial evidence and its legal determination of this issue de novo. (*Short*, *supra*, 42 Cal.App.5th at p. 915.)

### C.    Analysis

Here, there is no contention of actual prosecutorial vindictiveness. Thus, we must determine whether the new charge of child endangerment gave rise to an unrebutted presumption of vindictiveness. Defendant contends such presumption arose because the new charge increased his potential exposure to prison time. We disagree.

We note the following with regard to defendant's potential exposure. Defendant was initially charged with second degree murder, which carries a sentence of 15 years to life (§ 190, subd. (a)), and assault on a child causing death, which carries a sentence of 25 years to life (§ 273ab, subd. (a)). Following the acquittal for murder, the People could have proceeded against defendant for involuntary manslaughter, which carries a maximum sentence of 4 years (§§ 193, subd. (b), 1170, subd. (h)), and assault on a child causing death, which, again, carries a sentence of 25 years to life. However, the People instead elected to amend the information to charge child endangerment with enhancements for great bodily injury, which carries a maximum term of nine years (six years for the substantive offense, plus three years for the enhancement) (§§ 273a,

27.

subd. (a), 12202.7, subd. (a)), and, again, assault on a child causing death, with a corresponding sentence of 25 years to life.

It is beyond dispute that the charge of child endangerment is less serious than both the murder count and the assault count defendant was initially charged with. Moreover, this new charge did not increase defendant's potential sentence beyond the exposure in the original charging document. Defendant does not cite, and we do not find, any case finding a presumption of vindictiveness was raised by the addition of less serious charges that do not increase the defendant's exposure beyond that contained in the original charge. (Cf. *Twiggs*, *supra*, 34 Cal.3d at p. 369 [noting a presumption of vindictiveness could arise following a mistrial if a defendant is "faced with the possibility of a greater punishment than he could have received if the prosecution had secured a conviction"]; accord, *People v. Ledesma*, *supra*, 39 Cal.4th at p. 731 [stating that an inference of vindictive prosecution may be raised on retrial if "the prosecution increases the charges so that the defendant faces a sentence potentially more severe than the sentence he or she faced at the first trial"].) In this case, the first amended information did not expose defendant to a potential sentence more severe than that which he would have faced if he had been convicted of the murder charge and/or the assault charge in the original information.

Nonetheless, defendant contends a presumption of vindictiveness arises because the prosecutor increased defendant's potential exposure beyond that potentially available at the conclusion of the first trial, when the jury hung on involuntary manslaughter and assault on a child causing death. If defendant was convicted of those charges, he could have been sentenced to a maximum term of four years for involuntary manslaughter, and 25 years to life for assault. (§§ 193, subd. (b), 273ab, subd. (a).) However, he could only be punished under one of these two provisions, and thus the maximum sentence he could have served is 25 years to life. (§ 654, subd. (a).) The same is true for the potential sentence on the first amended information. Even if defendant had been convicted of both

28.

child endangerment and assault on a child causing death, the maximum sentence he could have served is 25 years to life. (§ 654, subd. (a).) Thus, his maximum potential exposure on retrial was unchanged. Under these circumstances, we cannot conclude the prosecutor " 'upped the ante' " by adding a less serious charge of child endangerment with great bodily injury.

Finally, defendant also appears to contend that a presumption of vindictiveness arose because the timing of the filing of the first amended information indicates it was filed in retaliation for defendant's rejection of the People's plea offer and his insistence on retrial. Defendant's argument in this regard relies primarily on the prosecutor's statement that the amendment was sought after defendant "ha[d] been asserting his right to a trial for a while," and "after [plea] negotiations broke down." Although inartfully stated, this appears to be an attempt by the prosecutor to explain that defendant's insistence on retrial and the People's decision to amend were not temporally related. Furthermore, defendant was aware of the People's intent to file the amended information well before he rejected the People's plea offer on the record in open court. (Cf. *Bordenkircher v. Hayes* (1978) 434 U.S. 357, 360 [finding no prosecutorial vindictiveness where, in the pretrial context, the defendant was aware of prosecutor's intent to increase severity of potential sentence prior to the defendant's rejection of plea offer].) In any event, as we have explained, defendant's assertion of his right to retrial could not have been chilled by the possibility of facing additional charges on retrial, where those charges did not increase his maximum potential exposure to punishment. (*Short*, *supra*, 42 Cal.App.5th at p. 917.)

Accordingly, we conclude the additional charges did not raise a presumption of prosecutorial vindictiveness.

## III.    Section 654

As an alternative argument, defendant contends the People were barred from proceeding on both charges – assault on a child causing death and child endangerment

with great bodily injury – by the multiple prosecution provision of section 654. Although this argument was not raised below, defendant contends a claim under section 654 cannot be waived or forfeited. Alternatively, he contends counsel was ineffective for failing to raise it. We review and reject defendant's claim on the merits. We therefore find no ineffective assistance requiring reversal, and no need to address the People's claim of forfeiture. (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14 [rejecting claim of ineffective assistance where claim fails on the merits].)

Section 654, subdivision (a) provides:

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. *An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.*" (Italics added.)

This prohibition against multiple prosecutions is designed to avoid "needless harassment and the waste of public funds." (*Kellett v. Superior Court* (1966) 63 Cal.2d 822, 827.) "In addition to preventing harassment, joinder avoids needless repetition of evidence and saves the state and the defendant time and money." (*Id.* at p. 826.) Thus, when "the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Id.* at p. 827, fn. omitted.)

Courts have developed two tests under *Kellett* to determine whether multiple offenses occurred during the same course of conduct and are thus subject to the multiple prosecution bar under section 654. " ' "Under one line of cases, multiple prosecutions are not barred if the offenses were committed at separate times and locations." ' " (*Short*,

30.

*supra*, 42 Cal.App.5th at p. 912.) A second line of cases uses the " ' " 'evidentiary test,' " ' " which provides that two offenses must be prosecuted together if " ' " 'the evidence needed to prove one offense necessarily supplies proof of the other.' " ' " (*Ibid.*) Whether the bar against multiple prosecution applies must be determined on a case-by-case basis. (*People v. Britt* (2004) 32 Cal.4th 944, 955.)

Examples of the application of the multiple prosecution provision of section 654 demonstrate why it is inapplicable on the facts of the instant case. In *Kellett*, the defendant was charged with a misdemeanor violation of exhibiting a firearm in a threatening manner, and separately charged with a felony violation of possession of a concealable weapon by a person who has been convicted of a felony, all in relation to the same incident of standing on a sidewalk with a pistol in his hand. (*Kellett*, *supra*, 63 Cal.2d at p. 824.) After he pled guilty to the misdemeanor, he moved to dismiss the felony information. (*Ibid*.) His motion was denied in the trial court, but our Supreme Court issued a writ of prohibition against the prosecution. (*Id*. at pp. 824, 829.) As previously stated, our Supreme Court held that, where "the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted *in a single proceeding* unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Id.* at p. 827, italics added, fn. omitted.) In other words, *Kellett* was concerned with subsequent prosecutions in separate proceedings.

Similarly, *People v. Ochoa* (2016) 248 Cal.App.4th 15, on which defendant primarily relies, involved separate prosecutions for offenses arising out of the same course of conduct. Specifically, the defendant was alleged to have received methamphetamine, stored it on his property, and sold it to a criminal street gang. (*Id.* at p. 19.) He first was charged with conspiracy to distribute methamphetamine and pled no

31.

contest to conspiracy and possession charges. (*Ibid.*) After sentencing, the prosecution indicted the defendant for active participation in the criminal street gang and conspiracy to distribute methamphetamine for the benefit of the gang. (*Ibid.*) The defendant pled no contest to conspiracy to distribute methamphetamine and admitted the offense was committed for the benefit of the gang. (*Ibid.*) On review, the Court of Appeal concluded the same course of conduct formed a significant part of the offenses in both prosecutions, and the prosecution was aware of defendant's conduct underlying the second prosecution at the time of the first prosecution. (*Id*. at pp. 40-41.) Thus, the second prosecution was barred under section 654 and *Kellett*.

With these examples in mind, we turn to the charge of assault on a child causing death. The prosecution did not pursue this charge in a subsequent prosecution within the meaning of section 654. To the contrary, this charge was included, with murder, in the original information. The jury then acquitted defendant of murder and hung on the assault charge. Within the same proceeding, the prosecution then elected to retry defendant on the assault charge.

Section 1160 expressly permits retrial in these circumstances. (§ 1160 ["Where two or more offenses are charged in any accusatory pleading, if the jury cannot agree upon a verdict as to all of them, they may render a verdict as to the charge or charges upon which they do agree, and the charges on which they do not agree may be tried again."].) Furthermore, defendant does not cite, and we do not find, any case suggesting that retrial of a hung count, within the context of an ongoing proceeding, is barred by section 654. Indeed, case law suggests a contrary result. (Cf. *Yeager*, *supra*, 557 U.S. at p. 118 [retrial of hung count is a continuance of the same criminal proceeding]; *Orlina v. Superior Court* (1999) 73 Cal.App.4th 258, 263-264 [retrial not barred where jury acquitted on charged offense and hung on lesser related offense]; *Brown*, *supra*, 35 Cal.App.3d at p. 323 [mistrial does not result in the culmination of the proceeding within the meaning of *Kellett*, and "the status of the case was the same as if there had been no

trial"].)  Accordingly, defendant's claim with respect to this charge is wholly without merit.

We next consider the charge of child endangerment, which was added to the information after the jury acquitted defendant of murder, but hung on involuntary manslaughter and assault on a child causing death.  We agree with those courts that have held that section 654's bar against multiple prosecutions does not apply to the amendment of an information to add new charges after a mistrial.  (*Short*, *supra*, 42 Cal.App.5th at pp. 913-914 [holding, on similar facts, that the purposes of the bar on successive prosecutions would not be served by barring additional charges]; cf. *Brown*, *supra*, 35 Cal.App.3d at p. 323 [where prosecutor adds new charges in amended information following total mistrial, § 654 does not apply]; *People v. Flowers* (1971) 14 Cal.App.3d 1017, 1019-1021 [amendment to add new charges after mistrial on all charges was within court's discretion].)  As stated above, the status of the assault charge following mistrial was the same as if there had been no trial (*Yeager*, *supra*, 557 U.S. at p. 118; *Brown*, at p. 323), a circumstance in which amendment to add additional charges is permissible.

Furthermore, the addition of the child endangerment charge does not result in harassment of defendant or waste of public resources, which section 654 was designed to avoid.  (*Kellett*, *supra*, 63 Cal.2d at p. 827.)  Defendant was subject to retrial on the assault charge, irrespective of whether new charges were permitted.  Because the child endangerment and assault charges involve the same underlying conduct, the additional charge would have minimal, if any impact, on the expenditure of public resources associated with retrial.  Similarly, because defendant was already subject to retrial on a more serious charge, we fail to see how the addition of the child endangerment charge constituted harassment.  (*People v. Davis* (2005) 36 Cal.4th 510, 558 [policies underlying § 654 are not served by barring prosecution where the defendant is already facing trial on more serious charges].)

Accordingly, we reject defendant's claim that retrial on the first amended information was barred by section 654.

## **DISPOSITION**

The judgment is affirmed.

DETJEN, Acting P.J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.